Luke A. Wake, Cal. Bar No. 264647*
Damien M. Schiff, Cal. Bar No. 235101*
Jeffrey W. McCoy, Cal. Bar No. 317377*
Charles T. Yates, Cal. Bar No. 327704*
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814
Telephone: (916) 419-7111
LWake@pacificlegal.org
DSchiff@pacificlegal.org
JMcCoy@pacificlegal.org
CYates@pacificlegal.org
   *Pro Hac Vice Pending

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| INSIDE PASSAGE ELECTRIC COOPERATIVE and ALASKA POWER ASSOCIATION,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. DEPARTMENT OF AGRICULTURE; and THOMAS VILSACK, in his official capacity as U.S. Secretary of Agriculture,<br><br>Defendants. | Case No. 3:23-cv-00204-SLG |

**COMPLAINT
(5 U.S.C. §§ 702, 706)**

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. §§ 702, 706.

2. The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-2202, 28 U.S.C. § 1361, and to vacate unlawful agency action under 5 U.S.C. § 706.

3. Venue is proper under 28 U.S.C. § 1391(e)(1)(C) because the defendants are officers, employees, and agencies of the United States and the plaintiffs reside within the District of Alaska. *See also* 5 U.S.C. § 703 (venue for actions under the Administrative Procedure Act is generally proper in "a court of competent jurisdiction").

## INTRODUCTION

4. The Inside Passage Electric Cooperative ("Cooperative") provides electricity to several low-income and predominantly indigenous communities, which are currently paying some of the highest utility rates in Alaska. That is so because the Cooperative is heavily dependent on diesel oil; however, there are abundant opportunities to improve its energy infrastructure and to stabilize utility rates—if only the U.S. Department of Agriculture ("Department") would stand aside.

5. Specifically, the Cooperative wants to pursue sustainable hydroelectric and geothermal energy projects that promise to reduce utility costs, and immeasurably improve the lives of the people it serves.

6. But the Department forecloses these desirable projects because the Secretary of Agriculture has decided that it is more important to enforce a heavy-handed ban on road construction than it is to enable energy projects in the Tongass National Forest region.

7. This "Roadless Rule" presents an insurmountable barrier for the Cooperative's energy goals because the communities it serves are entirely enveloped by the Tongass. Likewise, the Roadless Rule stands as a formidable obstacle for other members of the Alaska Power Association that wish to pursue energy projects in the region.

8. The Secretary has acted without authority in prohibiting road construction across vast expanses of federal lands that Congress wanted to remain open to reasonable public access and use. And worse, in violation of separation of powers, the Secretary has assumed unfettered lawmaking authority over a regulatory fiefdom of 193 million acres of federal land.

## PARTIES

9. Plaintiff Inside Passage Electric Cooperative is a non-profit, consumer-owned and governed electric utility (i.e., an "electric cooperative") that serves dispersed indigenous communities in remote areas of Southeast

Alaska. *See* Exhibit A, Declaration of Johanna M. Mitchell ("Mitchell Decl.") ¶ 3. The Cooperative operates four separate grids, which service the island communities of Hoonah, Kake, Chilkat Valley, Angoon, and Klukwan. *Id.* ¶ 4.

10. Plaintiff Alaska Power Association (the "Association") is a statewide trade association, representing electric utilities—including the Cooperative—that supply power to more than a half-million Alaskans. *See* Exhibit B, Declaration of Crystal Enkvist ("Enkvist Decl.") ¶ 4.

11. The Association has numerous members providing utility services in regions affected by the Roadless Rule. *Id.* ¶ 7.

12. The Association is governed by a Board of Directors. *Id.* ¶ 6. The Board is comprised of elected Directors, as proposed by Association members. *Id.* Association members pay annual dues. *Id.* ¶ 5.

13. The Cooperative and other Association members oppose Roadless Rule restrictions that inhibit their ability to improve their energy infrastructure. Mitchell Decl. ¶¶ 10-18; Enkvist Decl. ¶ 8.

14. Defendant United States Department of Agriculture is an agency of the United States government, under the direction and control of the United States Secretary of Agriculture. The Department enforces the Roadless Rule through the United States Forest Service ("Service"), which is a sub-agency within the Department. The Department is responsible for overseeing the Service.

15. Defendant Thomas Vilsack is the United States Secretary of Agriculture. He oversees the Department and the Service. He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### *USDA Imposes Roadless Rule Restrictions on 58.5 Million Acres*

16. The Department enforces its Roadless Rule to prohibit road construction across **58.5 million acres of national forestlands**. This amounts to a *de facto* prohibition on meaningful access and practical use of two percent of the United States landmass.

17. The Department has made no allowance for road access necessary for economically important and socially beneficial energy infrastructure projects. While the Roadless Rule allows for a few very limited exceptions, there is no exception for roads needed to develop hydroelectric or geothermal projects, or for any other project that requires road access—regardless of how carefully planned the project may be to avoid environmental concerns.

18. The Roadless Rule provides that the Secretary may permit Federal Aid Highways projects that serve "the public interest." But there is no governing standard for deciding what projects serve the "public interest" because neither Congress nor the Department has defined that term. As such, the Secretary may grant or deny such projects based entirely on his own discretion.

19. The Department decided to bluntly prohibit road construction and maintenance over these vast swaths of land. But Congress made the policy choice to allow roads in these areas in at least five statutes; those enactments signal that Congress has never given authority for the Secretary to impose sweeping restrictions on public access and use of these lands.

20. First, the Organic Administration Act of 1871 established that national forestlands should be open to the public for "all lawful purposes." 16 U.S.C. § 478.

21. Second, the Multiple Use Sustained Yield Act ("MUSYA") establishes that national forestlands should be managed to allow for "[m]ultiple use[s]" and "[s]ustained yield," which requires a balanced approach to conservation. 16 U.S.C. § 531. This congressional policy is incompatible with an inflexible rule that bluntly forecloses all activities that depend on road access across vast swaths of land—without accommodation for economically important and socially beneficial projects.

22. Third, the Wilderness Act of 1964 prohibits roads within congressionally designated wilderness areas, while leaving remaining federal lands open to public access and reasonable economic use.

23. Fourth, the Alaska National Interest Lands Conservation Act ("ANILCA") prohibits roads within congressionally designated wilderness areas in Alaska, while proscribing standards that generally enable public

access and use of national forestlands in other areas. ANILCA also prohibits the withdrawal of significant federal lands from public use, and expressly contemplates construction of new roads within the Tongass.

24. Fifth, the Tongass Timber Reform Act ("TTRA") contemplates continued access to the Tongass for economic purposes that require roads.

25. These statutes demonstrate that Congress knows how to weigh environmental concerns and the pressing need for reasonable access to and use of these lands. But the Roadless Rule displaces Congress' judgment in favor of a hardline antidevelopment policy.

26. Despite Congress' manifest desire to allow roads in national forests as needed for reasonable public access and use, the Department claims to have found authority to categorically ban roads in nebulous statutory language from long-extant statutes.

27. For example, the Department claims that it has extremely broad rulemaking powers because the Organic Act delegates authority to prohibit "destruction" of forestlands. 16 U.S.C. § 551.

28. Likewise, the Secretary claims tremendous discretion to impose whatever rules he deems appropriate for national forestlands because the MUSYA authorizes regulation to ensure "[m]ultiple use" and "[s]ustained yield," 16 U.S.C. § 531(a)-(b), and because the Act provides that "some land will be used for less than all of the resources." *Id.* § 531(a).

29. Accordingly, the Secretary has assumed discretion to unilaterally balance competing public values when extending Roadless Rule restrictions to the Tongass—knowing that the Rule would harm local communities.

30. Yet nothing in either the Organic Act or MUSYA provide direction as to how the Secretary should balance competing public values when regulating federal lands. Nor does either enactment provide direction as to whether or when the Department should prioritize either environmental or social/economic values when deciding what sort of access and use will be permitted in any given area.

### *USDA Exempts the Tongass Forest From the Roadless Rule and Then Changes Course to Reimposes Roadless Rule Restrictions*

31. The Department first imposed the Roadless Rule at the behest of President Clinton in 2001. *See* Special Areas; Roadless Area Conservation, 66 Fed. Reg. 3244 (Jan. 12, 2001) (codifying 36 C.F.R. § 294) ("Roadless Rule"). During the next Administration the Department promulgated a new rule to exempt the Tongass National Forest in 2005. *See* Special Areas; State Petitions for Inventoried Roadless Area Management Rule, 70 Fed. Reg. 25,654 (May 13, 2005) ("2005 Rule"). But the 2005 Rule was enjoined in the courts on procedural grounds.

32. As such, the Roadless Rule remained in effect—covering 9.37 million acres of the Tongass—until the Department again promulgated a

regulation to withdraw the Tongass in 2020. *See* Special Areas; Roadless Area Conservation; National Forest System Lands in Alaska, 85 Fed. Reg. 68,688 (Oct. 29, 2020). In lifting Roadless Rule restrictions, the Department asserted that "[r]oadless area management . . . is fundamentally an exercise in discretion and policy judgment concerning the best use of the [National Forest System] lands and resources . . . ." *Id.* at 68,691.

33. At that time, the Department concluded that it was appropriate to lift Roadless Rule restrictions because the Department had fundamentally changed its policy judgments. But the Department quickly changed course.

34. On January 27, 2023, the Department reimposed the Roadless Rule in the Tongass. Special Areas; Roadless Area Conservation; National Forest System Lands in Alaska, 88 Fed. Reg. 5252, 5255-56 (Jan. 27, 2023) ("Final Rule"). The Department explained that it had (yet again) shifted its "policy priorities." Final Rule, 88 Fed. Reg. 5252.

### *Injury to Inside Passage Electric Cooperative and Alaska Power Association*

35. The Cooperative and the Association's members want to further develop the energy infrastructure in Alaska. Mitchell Decl. ¶¶ 5-10; Enkvist Decl. ¶ 8. For example, the Cooperative would like to pursue geothermal projects in the Tongass to provide clean energy that would reduce utility costs and would generally benefit the 900+ residents of Hoonah. Mitchell Decl. ¶ 14.

Studies confirm the potential for generating geothermal electricity from nearby hot springs. *Id*. But the Cooperative cannot pursue this project because the Roadless Rule precludes construction of necessary access roads. *Id*.

36. The Cooperative has both near-term plans and long-term objectives to develop renewable-energy projects that will reduce its dependance on diesel fuel. *Id*. ¶ 10. The Cooperative intends to pursue such projects because it believes there are environmental benefits, in addition to substantial cost savings to indigenous communities that are currently paying some of the highest electricity rates in Alaska. *Id*. ¶¶ 8-9. And likewise other members of the Association wish to pursue important energy projects that would improve the lives of Alaskans living in remote forest communities.

37. But the Final Rule stands as a barrier to harnessing renewable energy sources—or for making any improvements to the energy grid in the Tongass region. Mitchell Decl. ¶¶ 10, 12-13; Enkvist Decl. ¶¶ 8-14. For the Cooperative, the Roadless Rule presents an insurmountable obstacle to commonsense energy solutions. That is so because without road access, the Cooperative would be limited to transporting necessary building materials and equipment by helicopter. Mitchell Decl. ¶¶ 10-12.

38. The Roadless Rule prevents the Cooperative from pursuing its infrastructure goals because it is economically infeasible, and sometimes

*Inside Passage Electric Coop. v. USDA*     10
No. 3:23-cv-00204-SLG
Case 3:23-cv-00204-SLG   Document 1   Filed 09/08/23   Page 10 of 18

logistically impossible, for the Cooperative to transport critical building materials and equipment by helicopter, *id.* ¶ 13.

39. For example, in conjunction with another Association member, the Cooperative sought to develop an intertie project that would have provided more reliable and cost-effective utility service to the community of Kake; however, with the Roadless Rule in place the project costs ballooned from an original estimate of $17.5 million to $65 million in 2010 dollars.[1] Mitchell Decl. ¶¶ 16-17. These added regulatory costs have killed the project for the time-being; however, the Cooperative would resume efforts to further this project if it could obtain required road access. *Id.* ¶ 18.

40. Given the extraordinary logistical challenges and added costs of pursuing energy projects without access roads, the Final Rule prevents the Cooperative and other Association members from pursuing their infrastructure goals because they cannot devote resources to hire consultants and engineers to draw plans, or to otherwise explore potential projects, that would require road access through the Tongass. *Id.* ¶ 13; Enkvist Decl. ¶ 9.

41. As one Association member explained: "[T]he Roadless Rule destroys the marginal feasibility of [otherwise desirable] projects because it is exponentially more expensive to construct hydroelectric projects without road

---

[1] An intertie is an interconnection permitting passage of current between two or more electric utility systems.

access. And, in some cases, it is logistically impossible to transport the heavy equipment needed to these remote sites without road access." *See* Exhibit C, Declaration of Clay Koplin ¶ 10.

42. For that matter, even during the short time when the Department exempted the Tongass from the Roadless Rule, members of the Association found it imprudent to plan infrastructure projects because of the uncertainty they faced, knowing that the Department still claimed discretionary powers to impose, withdraw, and reimpose Roadless Rule restrictions from one administration to the next. Enkvist Decl. ¶ 11. As such, they could not justify devoting significant resources into projects that would have to be scuttled with reimposition of the Roadless Rule. *Id*. And the Department's Final Rule proves these concerns were well founded. *Id*.

43. Still, Association members need access to Roadless Rule areas if they are to improve their energy infrastructure going forward. *Id*. ¶ 12. For example, one Association member anticipates a need for developing a hydroelectric project in the Tongass within the next ten years because it has reached maximum generating capacity for peak loads. *Id*. While this member anticipates the need for more electric power, studies confirm that hydroelectric is the only viable option going forward. *Id*. But a hydroelectric project is infeasible without road access. *Id*.

44. Likewise, the Roadless Rule impedes Association members' ability to access and maintain existing facilities, powerlines, and diversion pipes. Enkvist Decl. ¶ 13. And Association members could lower their maintenance costs for their existing utility systems if they could obtain road access through Roadless Rule areas. *Id.* ¶ 14. For example, one Association member has had increased maintenance costs—which have been passed on to consumers— because it has been limited to accessing many miles of existing transmission lines mostly by helicopter. *Id.* If the Final Rule were vacated, the member would work to facilitate road construction along this corridor. *Id.*

**DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS**

45. Each Plaintiff has a significant interest in whether the Final Rule was lawfully promulgated.

46. The Cooperative cannot pursue infrastructure projects because of the Final Rule. Mitchell Decl. ¶¶ 15-18. Likewise, the Final Rule presents formidable barriers for other Association members to develop desirable energy projects within Roadless Rule areas. Enkvist Decl. ¶ 8. And the Final Rule negates investment of resources to explore potential projects in the Tongass National Forest. *Id.* ¶ 9.

47. A decision declaring the Final Rule to be ultra vires, or in violation of separation of powers, would remedy these injuries by allowing the

Cooperative and other Association members to pursue infrastructure plans that require road access within the Tongass.

48. Plaintiffs have no plain, speedy, and adequate remedy at law for their injuries. Money damages are not available in this case.

49. This case is currently justiciable because the Final Rule went into effect on January 27, 2023, 88 Fed. Reg. 5252.

50. Therefore, declaratory and injunctive relief are appropriate to resolve this controversy.

## COUNT I

## The Final Rule Is Ultra Vires

## (Administrative Procedure Act, 5 U.S.C. § 706(2)(C))

51. The preceding paragraphs are incorporated herein by reference.

52. The Administrative Procedure Act requires this Court to hold unlawful and set aside any agency action that exceeds statutory authority. 5 U.S.C. § 706(2)(C).

53. In enacting the Organic Act and MUSYA, Congress established a statutory policy of both protecting national forestlands and ensuring continued public access and reasonable economic or socially beneficial uses. And the Secretary, and the Service under the direction of the Secretary, have a duty to manage national forestlands consistent with Congress' policy.

54. The Organic Act and MUSYA authorize the Secretary to exercise a limited degree of discretion to establish rules regulating access and use of national forestlands. The Secretary's discretion is limited to promulgating and enforcing rules tailored to prohibit harmful conduct as may be found necessary to protect a specific forest in consideration of localized conditions.

55. The Secretary's discretion is limited to promulgating and enforcing rules that both (a) protect against the destruction or deterioration of natural resources, and (b) enable continued public access and reasonable economic or socially beneficial uses of national forestlands.

56. The Secretary exceeded his statutory authority under the Organic Act and MUSYA in finalizing the Roadless Rule to prohibit construction and maintenance of roads across vast swaths of national forestlands.

57. The Secretary exceeded his statutory authority under the Organic Act and MUSYA in issuing the Final Rule to reimpose Roadless Rule restrictions to deny practical access, and reasonable economic and socially beneficial uses, within vast swaths of federal lands in the Tongass Forest.

58. The Final Rule was promulgated "in excess of statutory jurisdiction, authority, or limitations," in violation of 5 U.S.C. § 706(2)(C).

## COUNT II

## The Final Rule Violates Separation of Powers

## (U.S. Const. art. I, § 1 and 5 U.S.C. § 706(2)(B) and (C))

59. The preceding paragraphs are incorporated herein by reference.

60. The APA requires this Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

61. The U.S. Constitution vests all lawmaking powers in Congress, including the power to make all rules and regulations concerning territories or property of the United Sates. The Constitution likewise prohibits Congress from delegating its lawmaking powers.

62. When passing a law, therefore, Congress must make the fundamental policy decisions with which the law is concerned and leave to the Executive Branch only the job of filling in less consequential details or applying the law to a given set of facts. In other words, Congress must provide a sufficiently intelligible governing principle.

63. The charge to manage national forestlands to allow for "multiple-use and sustained-yield" of natural resources provides no intelligible principle for determining whether and to what extent public access and economic or socially beneficial uses should be allowed or prohibited if construed as expansively as the Department urges.

64. The charge to manage national forestlands to allow for "multiple-use and sustained-yield" of natural resources provides no intelligible principle for determining whether and to what extent any given area should be preserved in a natural state if construed as expansively as the Department urges.

65. The charge to manage national forestlands to allow for "multiple-use and sustained-yield" of natural resources provides no intelligible principle for weighing competing environmental, social, economic, or other public values—or for resolving conflicting environmental goals—if construed as expansively as the Department urges.

66. The Final Rule was promulgated "contrary to constitutional right, power, privilege, or immunity," in violation of 5 U.S.C. § 706(2)(B).

67. The Final Rule was promulgated "in excess of statutory jurisdiction, authority, or limitations," in violation of 5 U.S.C. § 706(2)(C).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for relief as follows:

1. A judgment declaring that the Final Rule is unlawful or unconstitutional because it reimposes the Roadless Rule, 36 C.F.R. Part 294, without statutory authority or in violation of the non-delegation doctrine, and that the Department lacks constitutional authority to enforce any rule bluntly restricting road construction through vast swaths of federal lands;

2. An injunction prohibiting the Defendants from enforcing the Final Rule against the Plaintiffs;

3. An order setting aside and vacating the Roadless Rule;

4. An award of reasonable attorney fees and costs, pursuant to 28 U.S.C. § 2412, or any other applicable authority; and

5. Any other relief the Court deems just and proper.

DATED: September 8, 2023.

Respectfully submitted,

LUKE A. WAKE*
DAMIEN M. SCHIFF*
JEFFREY W. McCOY*
CHARLES T. YATES*

By /s/ Luke A Wake
LUKE A. WAKE, *Pro Hac Vice*
Cal. Bar No. 264647

*Pro Hac Vice Pending*

*Attorneys for Plaintiffs*
*Inside Passage Electric Cooperative*
*and Alaska Power Association*

*Inside Passage Electric Coop. v. USDA*
No. 3:23-cv-00204-SLG
18
Case 3:23-cv-00204-SLG Document 1 Filed 09/08/23 Page 18 of 18